IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

JOHN DeROSIER,

                    Plaintiff,

     v.

DUSTIN M. CZARNY, *et al.*,

                    Defendants.

_____

Civil Action No.
5:18-CV-0919 (GLS/DEP)

APPEARANCES:

OF COUNSEL:

FOR PLAINTIFF:

WEBSTER, SZANYI LAW FIRM
1400 Liberty Building
Buffalo, New York 14202

JEREMY A. COLBY, ESQ.

FOR DEFENDANTS CZARNY
AND SARDO:

ONONDAGA COUNTY DEPARTMENT
 OF LAW
John H. Mulroy Civic Center
421 Montgomery Street
10th Floor
Syracuse, New York 13202

BENJAMIN A. YAUS, ESQ.

FOR REMAINING DEFENDANTS:

HON. LETITIA JAMES
New York State Attorney General
The Capitol
Albany, New York 12224

C. HARRIS DAGUE, ESQ.
KELY L. MUNKWITZ, ESQ.
Assistant Attorneys General

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Since 1890, New York elections have been subject to a provision prohibiting certain electioneering conduct in and around polling places, including the display of political banners, buttons, posters, or placards in polling places and within a one-hundred-foot radius thereof. In this proceeding, plaintiff challenges that restriction, and a related statute setting forth criminal penalties associated with unlawful electioneering, arguing that those laws abridge the rights of plaintiff and others as guaranteed under the First Amendment to the United States Constitution.

Plaintiff's challenge is based principally upon *Minnesota Voters' Alliance v. Mansky*, 138 S. Ct. 1876 (2018), in which the United States Supreme Court determined that the State of Minnesota's so-called "political apparel ban" failed to withstand a First Amendment challenge. Relying on that case, plaintiff argues that the New York State statutes are facially unconstitutional, and that the defendants, including representatives of the New York State and Onondaga County Boards of Elections, have violated his civil rights through the enforcement of those provisions.

Prior to answering, both the State defendants and County defendants moved for the entry of summary judgment dismissing plaintiff's

2

First Amendment claims. Plaintiff has responded in opposition to those motions, arguing in part that they are premature since discovery has not yet occurred, and in any event lack merit, and has cross-moved for summary judgment in his favor as against all defendants. For the reasons set forth below, I recommend that the summary judgment motions filed by the State defendants and County defendants be granted, and that plaintiff's complaint be dismissed.

I.     BACKGROUND

Plaintiff John DeRosier is a resident of Onondaga County, and a registered New York voter. Dkt. No. 1 at 4. Plaintiff is an enrolled member of the Independence Party in New York. Dkt. No. 1 at 9. In his complaint, which was filed in advance of the November 2018 general election, plaintiff expressed his desire to display placards for favored candidates within and outside of an official polling place in the 2018 primary and general elections. Dkt. No. 1 at 4, 9, 10. More specifically, and as alleged in the complaint, plaintiff wishes to "to wear political buttons . . . including but not limited to political buttons expressing support for his favored candidates and/or conservative causes," and intends to "carry political placards into the polling place, for personal reference with respect to his favored candidates, to aid in casting a ballot." *Id.* at 4.

3

The New York State Board of Elections ("State Board') was established in 1974 as a bipartisan entity responsible for the administration and enforcement of laws related to elections in the state. Dkt. No. 21-1 at 1; *see also* 1974 N.Y. Sess. Laws Ch. 604. As part of its duties, the State Board aids local election boards and investigates complaints of possible violations of applicable laws. Dkt. No. 21-1 at 1; *see generally* N.Y. Elec. Law § 3-102. Defendants Peter S. Kosinski and Douglas A. Kellner are co-chairs of the State Board, and defendants Andrew J. Spano and Gregory P. Peterson are commissioners of the State Board (collectively, the "State defendants"). Dkt. No. 1 at 5; *see also* Dkt. No. 21-1 at 2. Defendants Dustin M. Czarney and Michele L. Sardo are commissioners of the Onondaga County Board of Elections ("County Board") (collectively, the "County defendants"). Dkt. No. 1 at 5; Dkt. No. 19-10 at 2.

In the wake of the Supreme Court's decision five days earlier in *Minnesota Voters' Alliance*, on or about June 20, 2018, the State Board sent guidance to all local and county elections boards, including representatives of the Onondaga County Board of Elections, advising that following the Supreme Court's decision, New York Election Law § 8-104(1) remains valid. Dkt. No. 21-1 at 2; Dkt. No. 19-10 at 2; Dkt. No. 21-2 at 3;

4

Dkt. No. 21-2 at 7-8; *see* Dkt. No. 21-4. Further guidance was issued by the State Board on October 3, 2018, in advance of the November 2018 general election. Dkt. No. 21-2 at 4-5, 18-19. That guidance provides, in relevant part, as follows:

> This prohibition on 'political banner[s],' 'button[s],' and 'poster[s] and placard[s]' applies only in the narrow context of the prohibition on 'electioneering within the polling place' and the 'one hundred foot radial.' That is to say, to constitute a violation of New York law a banner, button, poster or placard must constitute 'electioneering.'
>
> An electioneering communication is one which seeks the election of a candidate or vote for a political party or independent body on the ballot within the poll site. Accordingly, a violation . . . must contain the name of a candidate, political party, independent body or a direct reference to a ballot proposal on the ballot which contextually seeks votes.

Dkt. No. 21-2 at 18-19 (internal quotations marks omitted).

Plaintiff's primary challenge in this case is centered upon section 8-104(1) of New York's Election Law, which defendants characterize as an "anti-electioneering" provision and which provides as follows:

> The American flag shall be kept displayed at each polling place throughout the election. Facsimile ballots, voter information posting and distance markers shall not be taken down, torn or defaced during the election. While the polls are open no person shall do any electioneering within the polling place, or in any public street, within a one hundred

5

> foot radial measured from the entrances designated
> by the inspectors of election, to such polling place
> or within such distance in any place in a public
> manner; and no political banner, button, poster or
> placard shall be allowed in or upon the polling place
> or within such one hundred foot radial. While the
> polls are open no person shall consume any
> alcoholic beverages within the polling place.

N.Y. Elec. L. § 8-104(1). Violations of the electioneering provision of the law are subject to misdemeanor criminal penalties under section 17-130(4) of New York's Election Law.

In his complaint, plaintiff asserts that the prohibitions of New York Election Law § 8-104(1), and the parallel provision of the New York Election Law § 17-130(4), are unconstitutional in light of the Supreme Court's decision *Minnesota Voters' Alliance*. *See generally* Dkt. No. 1. He seeks a declaratory judgment to that effect, along with permanent injunctive relief.[1] *Id*. at 11-16.

## II.   PROCEDURAL HISTORY

Plaintiff commenced this action on August 3, 2018 against the County defendants and State defendants in their official capacities only. *See generally* Dkt. No. 1. Plaintiff's complaint asks that the court to declare

---

[1]   Although plaintiff's complaint purports to seek a preliminary injunction among the relief requested, *see* Dkt. No. 1 at 2,3, 15, plaintiff did not move the court for a preliminary injunction, or otherwise request such an order pursuant to Rule 65 of the Federal Rules of Civil Procedure.

that the two provisions at issue, N.Y. Elections Law §§ 8-104(1) and 17-130(4), are unconstitutional to the extent that they apply to political buttons or political placards; that defendants be enjoined from enforcing those provisions; and that he be awarded reasonable attorney's fees pursuant to 42 U.S.C. § 1988(b). *Id*.

On October 24, 2018, the County defendants filed a pre-answer motion for summary judgment dismissing plaintiff's claims.[2] Dkt. No. 19. The State defendants soon followed with their pre-answer summary judgment motion, filed on October 26, 2018. Dkt. No. 24. Plaintiff responded in opposition to both motions and likewise cross-moved for the

---

[2]     While a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure automatically extends the time under which a defendant must file an answer, there is no similar rule governing a defendant's obligation to answer a complaint when he files a pre-answer motion for summary judgment pursuant to Rule 56. *Compare* Fed. R. Civ. P. 12(a)(4) *with* Fed. R. Civ. P. 56; *see also* 10A Alan Wright *et al.*, *Federal Practice & Procedure* § 2718 (4th ed.). Most courts that have determined that Rule 12(a)(4) operates by analogy to a defendant that has filed a pre-answer summary judgment motion and, therefore, have declined to find a defendant in default by failing to file an answer until after disposition of the motion. *See Rashidi v. Albright*, 818 F. Supp. 1354, 1356 (D. Nev. 1993) ("Although Rule 12 does not specifically allow for a summary judgment motion to toll the running of the period within which a responsive pleading must be filed, by analogy the language would seem to apply[.]"); *but see Poe v. Cristina Copper Mines, Inc.*, 15 F.R.D. 85, 87 (D. Del. 1953) (finding that the "extension of time to file a response pleading until determination of a motion for summary judgment is not a definite and fixed right but a matter to be granted or denied under Rule 6(b)"). In this instance, exercising my discretion, I will *sua sponte* order a stay of defendants' time to answer plaintiff's complaint until fourteen days after a final determination is issued with respect to the parties' motions, in the event that the action survives. *Snyder v. Goord*, 05-CV-1284, 2007 WL 957530, at *5 (N.D.N.Y. Mar. 29, 2007) (McAvoy, J., *adopting report and recommendation by* Peebles, M.J.).

entry of summary judgment as against both groups of defendants on December 18, 2018. Dkt. No. 24. The County defendants and State defendants have since filed papers in opposition to plaintiff's cross-motions and in reply to plaintiff's opposition to their motions. Dkt. Nos. 29, 30, 31. The parties' cross-motions have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B). *See* Dkt. No. 28.

III.    DISCUSSION

    A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Emp'rs' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

In a case such as this, where the parties have filed cross-motions for summary judgment, "a court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Boy Scouts of Am. V. Wyman*, 335 F.3d 80, 88 (2d Cir. 2003) (quotation marks omitted).

B.      Plaintiff's Rule 56(d) Objection to Defendants' Motions[3]

Plaintiff objects to defendants moving for summary judgment without his first having had an opportunity to conduct discovery, pointing out that defendants have relied upon a record that includes extrinsic materials. *See generally* Dkt. No. 24-4 at 6. Plaintiff requests an opportunity to engage in discovery prior to the merits of his claims being addressed. *See generally id.*

The Second Circuit has explained that, ordinarily, "summary judgment should be granted if *after discovery*, the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof." *Hellstrom v. U.S. Dep't of*

---

[3]      In 2010, Rule 56 was substantially revised to set out and improve the procedures for making, opposing, and deciding motions for summary judgment. Because the revision also resulted in material being moved into different subdivisions than where it initially was found, including the relocation of Rule 56(f) to 56(d), certain precedent remains valid, but the citation of the rule may be different as a result of this revision.

*Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) (quotation marks and alterations omitted) (emphasis in original). Before granting a motion for summary judgment, a court should insure that the non-moving party has " 'had the opportunity to discovery information that is essential to his opposition to the motion for summary judgment.' " *Id.* (quoting *Trebor Sportswear Co. v. The Ltd. Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989)).

Although "[t]here is a critical distinction . . . between cases where a litigant opposing a motion for summary judgment requests a stay of that motion to conduct *additional* discovery and cases where that same litigant opposes a motion for summary judgment on the ground that it is entitled to an opportunity to *commence* discovery with respect to [the] claims," *Crystalline H2O, Inc. v. Orminski*, 105 F. Supp. 2d 3, 6-7 (N.D.N.Y. 2000) McAvoy, J.) (emphasis in original), the Second Circuit has nonetheless recognized that in rare cases, summary judgment may "be granted against a [party] who has not been afforded the opportunity to conduct discovery." *Hellstrom*, 201 F.3d at 97 (citing *Sutera v. Schering Corp.*, 73 F.3d 13, 18 (2d Cir. 1995); *Meloff v. New York Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995); *Jones v. Coughlin*, 45 F.3d 677, 680 (2d Cir. 1995)).

Rule 56(d) of the Federal Rules of Civil Procedure "addresses cases where a litigant opposing summary judgment requests additional

discovery." *Crystalline H2O, Inc.*, 105 F. Supp. 2d at 6-9. That rule provides that,

> [i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to a motion for summary judgment], the court may
>
> (1)  defer considering the motion or deny it;
>
> (2)  allow time to obtain affidavit declarations or to take discovery; or
>
> (3)  issue any other appropriate order.

Fed. R. Civ. P. 56(d). It was designed to afford a non-moving party with a fair opportunity to engage in discovery before having to oppose a summary judgment motion.

To successfully assert a Rule 56(d) defense to a summary judgment motion, the non-movant should "file an affidavit explaining (1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine [dispute] of material fact, (3) what effort the affiant has made to obtain those facts, and (4) why [those efforts were] unsuccessful[.]" *Hudson River Sloop Clearwater, Inc. v. Dep't of Navy,* 891 F.2d 414, 422 (2d Cir. 1989) (citing *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 925-27 (2d Cir. 1985)); *accord*, *Crystalline H20, Inc.*, 105 F. Supp. 2d at 6; *Young v.*

12

*Corbin*, 889 F. Supp. 582, 584-85 (N.D.N.Y. 1995) (McAvoy, J.). Although the failure to file an affidavit pursuant to Rule 56(d) is not automatically fatal, "the failure to file a Rule 56(d) affidavit sufficiently explaining the need for additional discovery 'is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.' " *Lunts v. Rochester City Sch. Dist.*, 515 F. App'x 11, 13–14 (2d Cir. 2013*)* (quoting *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir. 1994)); *see also Falso v. Rochester City Sch. Dist.*, 460 F. App'x 60, 61-62 (2d Cir. 2012) ("[The plaintiff] did not submit an affidavit in the district court setting forth the additional facts he sought to discover under Fed. R. Civ. P. 56(d). That omission is 'itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.' " (quoting *Paddington Partners*, 34 F.3d at 1137).

Plaintiff has failed to carry his burden under Rule 56(d). Although he summarily argues that defendants' motion is premature, the mere fact that defendants have moved for summary judgment prior to answering does not *ipso facto* render their respective motions premature. Indeed, Rule 56(b) of the Federal Rules of Civil Procedure expressly contemplates that the "motion for summary judgment *at any time* until 30 days after the close of all discovery." (emphasis added). At the same time, while arguing the

prematurity of defendants' motions, plaintiff has stated "discovery is not needed," *see, e.g.*, Dkt. No. 24-3 at 3, and has himself moved for the entry of summary judgment in his favor. *See generally* Dkt. No. 24.

More significantly, plaintiff's reference to the need for discovery in his memorandum of law in opposition to defendants' motions is not an adequate substitute for a Rule 56(d) affidavit.[4]  An affidavit detailing, *inter alia*, the evidence that he seeks and the relevance of that evidence to the underlying the motion would have substantially aided the court in evaluating plaintiff's otherwise conclusory claim. *See Crystalline H2O, Inc.*, 105 F. Supp. 2d at 8 ("Although the affidavit filed by [the d]efendants' counsel regarding the need to conduct discovery is arguably general, this can be explained, in part, by the fact that discovery has not yet commenced[.]").

For these reasons, I recommend that plaintiff's claim that summary judgment is premature be rejected by the court.

C.     *Minnesota Voters' Alliance v. Mansky*

For well over a century, the State of Minnesota has prohibited

---

[4]     The declaration of plaintiff's counsel makes only one passing reference to discovery not having been commenced, and does not otherwise detail what relevant discovery he seeks. Dkt. No. 24-1 at ¶ 28. In addition, plaintiff also refers to Rule 56(d) in his response to defendants' statements of undisputed material facts, submitted pursuant to Local Rule 7.1(a)(3), but that too is not an adequate substitute for a Rule 56(d) affidavit.

individuals from wearing "[a] political badge, political button, or other

political insignia . . . at or about the polling place on primary or election

day." 1912 Minn. Laws, 1st Spec. Sess., Ch. 3, § 13 (now codified at Minn.

Stat. § 211B.11(1)). The State of Minnesota is certainly not alone in its

limitation of certain speech in and around polling places on Election Day;

all fifty states and the District of Columbia have laws limiting speech in

some form at and near polling places. *Minnesota Voters All.*, 138 S. Ct. at

1883; *see also* Point III.D, *infra*.

Individuals that violated this "political apparel ban" were subject to

an administrative process before the Minnesota Office of Administrative

Hearings, which was empowered to issue a reprimand or impose a civil

penalty upon finding a violation. Minn. Stat. §§ 211B.32, 211B.35(2)

(2014). That administrative body could also refer the complaint to the

county attorney for prosecution as a petty misdemeanor; the maximum

penalty for the offense was a fine of $300. Minn. Stat. §§ 211B.11(4)

(Supp. 2017), 211B.35(2) (2014), 609.02(4a) (2016).

Prior to the 2010 general election, a group of concerned Minnesota

voters, referring to themselves as "Election Integrity Watch" ("EIW"),[5]

---

[5]     EIW consisted of the Minnesota Voters Alliance ("MVA") and other "likeminded groups and individuals" also a part of that lawsuit. *Minnesota Voters All.*, 138 S. Ct. at 1884.

sought a temporary restraining order and preliminary injunction from a federal district court. *Minnesota Voters All.,* 138 S. Ct. at 1884. The court denied the requested relief, concluding that EIW was "not likely to succeed on the merits of their claims," and permitting the ban to remain in effect for the upcoming election. *See Minnesota Majority v. Mansky*, 789 F. Supp. 2d 1112, 1117 (D. Minn. 2011) (subsequent history omitted). In response to the lawsuit and in order to assist local election officials in determining which materials fell within meaning of "political" for purposes of the ban, an "Election Day Policy" was distributed, which included the following examples of apparel falling within the scope of Minnesota's ban:

- Any item including the name of a political party in Minnesota, such as the Republican, [Democratic–Farmer–Labor], Independence, Green or Libertarian parties.

- Any item including the name of a candidate at any election.

- Any item in support of or opposition to a ballot question at any election.

- Issue oriented material designed to influence or impact voting (including specifically the 'Please I.D. Me' buttons).

- Material promoting a group with recognizable political views (such as the Tea Party, MoveOn.org, and so on).

*Minnesota Voters All.,* 138 S. Ct. at 1884. Thereafter, a number of

members of the EIW reported difficulties in voting on Election Day.[6]
*Minnesota Voters All.*, 138 S. Ct. at 1884; *see also Minnesota Majority*,
789 F. Supp. 2d at 1118-19 (recounting the difficulties experienced by
some voters on Election Day).

Following additional proceedings before the district court and Eighth
Circuit, the Supreme Court ultimately granted EIW's petition for *certiorari*
review, limited to a First Amendment facial challenge to the
constitutionality of Minnesota Statute § 211B.11(1). *Minnesota Voters All.
v. Mansky*, 138 S. Ct. 446 (2017) (memorandum). In an opinion delivered
by Chief Justice John Roberts on June 14, 2018, the Supreme Court
concluded that Minnesota law was unconstitutional on its face. *See
generally Minnesota Voters All.*, 138 S. Ct. at 1876.

In striking down section 211B.11(1) of the Minnesota Statute, the
Supreme Court observed that the first three items of Election Day Policy
were "clear enough." *Minnesota Voters All.*, 138 S. Ct. at 1889. However,
when considering the " 'authoritative constructions' in interpreting a state

---

[6]      "One individual was asked to cover up his Tea Party shirt. Another refused to
conceal his 'Please I.D. Me' button, and an election judge recorded his name and
address for possible referral. And [another individual]-who was wearing the same
button and a T-shirt with the words 'Don't Tread on Me' and the Tea Party Patriots
logo-was twice turned away from the polls altogether, then finally permitted to vote
after an election judge recorded his information." *Minnesota Voters All.,* 138 S. Ct. at
1884.

law," *Minnesota Voters All.,* 138 S. Ct. at 1889 (quoting *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992)), the final two guidelines "raise[d] more questions than . . . answers." *Minnesota Voters All.,* 138 S. Ct. at 1890.

"Although there is no requirement of narrow tailoring in a nonpublic forum, the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Minnesota Voters All.,* 138 S. Ct. at 1888 (citing *Cornelius v. NAACP Legal Def. & Educ. Fund Inc.*, 473 U.S. 788, 806 (1985)). "[T]he unmoored use of the term 'political' in the Minnesota law, combined with haphazard interpretations the State . . . provided in official guidance and representations to th[e] Court," led the Supreme Court to conclude that the Minnesota's political apparel ban did not survive the "forgiving" reasonableness test. *Minnesota Voters All.,* 138 S. Ct. at 1888.

D.    The "Australian System" and the Enactment of New York Election Law § 8-104(1)

"Casting a vote is a weighty civic act, akin to a jury's return of a verdict, or a representative's vote on a piece of legislation." *Minnesota Voters All.*, 138 S. Ct. at 1887. Yet, the formative elections in the country " 'were not a very pleasant spectacle for those who believed in democratic government.' " *Id.* at 1883 (quoting *Burson v. Freeman*, 504 U.S. 191, 202

18

(1992)).

As the Supreme Court once explained, during the colonial period of America, government officials were elected by the *viva voce* voting scheme—a method that "was not a private affair, but an open, public decision, witnessed by all and improperly influenced by some." *Burson*, 504 U.S. at 200. Following the formation of the Union, many states began to transition to the paper ballot, but "the evils associated with the earlier viva voce system reinfected the election process; the failure of the law to secure secrecy opened the door to bribery and intimidation." *Id.* at 200-01; *Silberberg v. Board of Elec. of NY*, 272 F. Supp. 3d 454, 476 (S.D.N.Y. 2017) (observing that "vote buying and voter intimidation were rampant.").

New York was one the earliest adopters of the so-called "Australian system" of voting.[7] *Burson*, 504 U.S. at 203. The roots of the current version of New York Election Law § 8-104(1) can be traced back to at

---

[7]     According to the Supreme Court,

> [t]he most famous feature of the Australian system was its provision for an official ballot, encompassing all candidates of all parties on the same ticket. But this was not the only measure adopted to preserve the secrecy of the ballot. The Australian system also provided for the erection of polling booths (containing several voting compartments) open only to election officials, two 'scrutinees' for each candidate, and electors about to vote.

*Burson*, 504 U.S. 191 (citing J. Wigmore, *The Australian Ballot System as Embodied in the Legislation of Various Countries* 69, 71, 78, 79 (1889)).

least 1890.[8] *Silberberg v. Board of Elec. of NY*, 272 F. Supp. 3d 454, 476

(S.D.N.Y. 2017) ("Expressive activities have been restricted at polling sites

in New York since the adoption of the Australian ballot reforms in 1890");

*see* 1890 Sess. Law of N.Y. Ch. 262. As part of an overall legislative

measure "to promote the independence of voters at public elections,

enforce the secrecy of the ballot, and provide for the printing and

distribution of ballots at public expense," the New York Legislature

enacted a law, which provided in relevant part:

> No person shall do any electioneering on election
> day within any polling place, or in any public street
> or room, or in a public manner, within one hundred
> and fifty feet of any polling place.

1890 N.Y. Sess. Laws. Ch. 262, § 35, as amended 1891 N.Y. Sess. Laws

Ch. 296. The provision has undergone a number of revisions to arrive at

its current iteration, set forth above. *See* pp. 5-6, *ante.*

    E.    <u>First Amendment Considerations</u>

The First Amendment guarantees the right of freedom of speech to

individuals and groups; it speaks in strong terms: "Congress shall make no

law . . . abridging the freedom of speech." U.S. Const. Amend. 1. "The

---

[8]    The New York Legislature's attempt to adopt ballot reform in 1888 was vetoed by Governor David B. Hill, who, *inter alia*, specifically objected to restricting the "right of the people to converse with and 'electioneer' one another at the polls." 8 CHARLES Z. LINCOLN, ED., MESSAGES FROM THE GOVERNORS 578.

freedom of speech . . . which [is] secured by the First Amendment against abridgment by the United States, [is] among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgment by a State." *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940).

"[T]he initial task of a court faced with a dispute regarding First Amendment activity on government property is to define the nature of the property at issue." *Zalaski v. City of Bridgeport Police Dept.*, 613 F.3d 336, 341 (2d Cir. 2010). To assist with this task, the Supreme Court has defined various "fora for expression . . . that, correspondingly, fall along a spectrum of constitutional protection," from highest to lowest. *Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 625 (2d Cir. 2005); *see Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983) ("The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue.") In evaluating whether a particular space should be classified as a traditional public forum, a designated or limited public forum, or a nonpublic forum—the three recognized categories—the court must consider the space's compatibility with expressive activity and whether the government's general "policy and

practice" shows that the forum is intended to be used for speech by the public. *Paulsen v. Cty. of Nassau*, 925 F.2d 65, 69 (2d Cir. 1991).

In this case, New York's prohibition on "political banner[s], button[s], poster[s] or placard[s]" applies only in and within one hundred feet of a specific location: an official polling location. N.Y. Elec. L. § 8-104(1). The parties agree that the interior of a polling location is properly considered a nonpublic forum. Plaintiff argues, however, that pursuant to the Supreme Court's decision in *Burson*, the environs of the polling place, which can include streets and sidewalks, should be classified as a "public forum." Dkt. No. 24-5 at 20. Although the State defendants note that there has been some disagreement over how to classify the area around an official polling location since *Burson* was decided,[9] they nonetheless agree that the "100-foot radial area around a polling place has been deemed a 'public' forum." Dkt. No. 21-9 at 10-11 (citing *Burson*, 504 U.S. at 198-211). As a result, I conclude that while the interior of a polling place is properly classified as nonpublic fora, for purposes of this report and recommendation, and without otherwise deciding, I will assume that the

---

[9]    In *Burson*, a plurality of the justices upheld the State of Tennessee's determination that a one-hundred-foot campaign-free zone outside the polls was necessary to secure the advantages of the secret ballot and protect the right to vote. *Burson*, 504 U.S. at 210-211. In a concurring opinion, however, Justice Scalia, argued that the subject area outside the polling place is more properly categorized as a "nonpublic forum." *Burson*, 504 US at 214 (Scalia, J.) (concurring in judgment).

area within a one-hundred-foot radius of a polling location constitutes a traditional public forum. *Burson*, 504 U.S. at 196-97.

The court is next tasked with considering whether the New York restriction under consideration is content based or content neutral. *See generally Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994). While, on one hand, "laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral," on the other hand, "laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Id.* at 643 (citing, *inter alia*, *Burson*, 504 U.S. at 197). The New York restriction under consideration, much like the Tennessee restriction considered in *Burson*, "is not a facially content-neutral time, place, or manner restriction." *Burson*, 504 U.S. at 197; *see* N.Y. Elec. L. § 8-104(1). This is because

> [w]hether individuals may exercise their free speech rights near polling places depends entirely on whether their speech is related to a political campaign. The statute does not reach other categories of speech, such as commercial solicitation, distribution, and display.

*Burson*, 504 U.S. at 197; *see Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227, 192 L.Ed.2d 236 (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic

23

discussed or the idea or message expressed.").

Having determined that the section 8-104(1) of New York Election Law is a content-based regulation of political speech that at least partially extends to traditional public fora, I must examine the provision by applying to strict or exacting scrutiny.[10] *Burson*, 504 U.S. at 198; *see Carey v. Brown*, 447 U.S. 455, 461-62 (1980). Under this level of judicial scrutiny, a regulation will survive only if the state shows " 'that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end.' " *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 118 (1991) (*quoting Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231 (1987)). Although "this is a heavy burden, it is not true 'that strict scrutiny is strict in theory, but fatal in fact.' " *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 246 (2d Cir. 2014) (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995)).

    1.   <u>New York Election Law § 8-104(1) Furthers a Compelling State Interest</u>

It is beyond cavil "that a State 'indisputably has a compelling interest

---

[10]    In this case, it is not necessary to parse the official polling location (nonpublic forum) from the one-hundred-foot radius (public forum) because if the New York statute satisfies strict scrutiny—the highest level of judicial review—it will necessarily satisfy lower levels of scrutiny.

in preserving the integrity of its election process.' " *Burson*, 504 U.S. at

199 (quoting *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S.

214, 231 (1989)). As a result, the Supreme Court "has 'upheld generally

applicable and evenhanded restrictions that protect the integrity and

reliability of the electoral process itself,' " which includes "protecting voters

from confusion and undue influence." *Burson*, 504 U.S. at 199 (quoting

*Anderson v. Celebrezze*, 460 U.S. 780, 788, n. 9 (1983) (citing *Eu*, 489

U.S. at 228-29). "In other words, [the Supreme Court] has recognized that

a State has a compelling interest in ensuring that an individual's right to

vote is not undermined by fraud in the election process." *Burson*, 504 U.S.

at 199.

In *Burson*, the Supreme Court upheld a Tennessee law that

prohibited certain campaign related speech, including "the display or

distribution of campaign materials within 100 feet of the entrance to a

polling place." *Burson*, 504 at 193-95. Likewise, in *Minnesota Voters

Alliance*, although the Minnesota statue did not survive, the Supreme

Court nonetheless concluded that "[t]he State may reasonably take steps

to ensure that partisan discord not follow the voter up to the voting booth,

and distract from a sense of shared civic obligation at the moment it

counts the most. That interest may be thwarted by displays that do not

raise significant concerns in other situations." *Minnesota Voters Alliance*, 135 S. Ct. at 1888; *see also id.* ("Minnesota may choose to prohibit certain apparel there because of the message it conveys, so that voters may focus on the important decisions immediately at hand."). Both statutes examined by the Supreme Court were intended to combat the same evils that the New York statute was intended to address: vote buying and voter intimidation. *See Silberberg*, 272 F. Supp. 3d at 470.

In this case, the State defendants have submitted the declaration of non-party Thomas E. Connolly, the Direction of Election Operations for the State Board. Dkt. No. 21-2. In that declaration, Connolly asserts that section 8-104 of New York's Election Law is in furtherance of the State Board's overall goal of ensuring "a safe and fair polling place so that all eligible New York voters can cast their ballot free from intimidation, undue influence and corruption, so as to protect the overall sanctity, fairness and accuracy of elections." *Id.* at 3. For his part, plaintiff does not disagree and acknowledges that New York "has a compelling interest in election integrity." Dkt. No. 24-4 at 25.

Accordingly, and in light of plaintiff's concession on this point, I recommend that the court conclude that New York Election Law § 8-104(1) furthers a compelling state interest.

2.    New York Election Law § 8-104(1) is Narrowly Tailored

This leaves one question for the court to consider: whether New York Election Law § 8-104(1) is narrowly tailored to serve the State's compelling interest in the integrity of the election process. "To survive strict scrutiny, however, a State must do more than assert a compelling state interest—it must demonstrate that its law is necessary to serve the asserted interest." *Burson*, 504 U.S. at 199; *see Reed*, 135 S. Ct. at 226. To make this showing, the state must "prove that the proposed alternatives will not be as effective as the challenged statute." *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 665 (2004). Because speech must not be restricted further than necessary to achieve the state's interest, the statute must be "the least restrictive alternative that can be used to achieve that goal.' *Id.* at 666. In other words, the statute will be struck down if the government does not prove that "the challenged regulation is the least restrictive means among available, effective alternatives." *Id.* "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).

Plaintiff's argument that the section 8-104(1) of New York's Election Law is not narrowly tailored is premised entirely upon the court viewing its

facial challenge in a vacuum and without looking beyond the text of the

statute. Dkt. No. 24-5 at 24-25. In evaluating a facial challenge, however,

the court must consider "authoritative constructions . . . , including [the

State's] own implementation and interpretation of it." *Forsyth Cty., Ga. v.*

*Nationalist Movement*, 505 U.S. 123, 131 (1992); *see Hoffman Estates v.*

*The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494, n. 5 (1982) ("[i]n

evaluating a facial challenge to a state law, a federal court must . . .

consider any limiting construction that a state court or enforcement agency

has proffered."). "Any inadequacy on the face of the [statute can be] . . .

more than remedied by the [State's] narrowing construction." *Ward*, 491

U.S. at 796.

Comparing the term "political" in the New York statute to the term

"political" in the Minnesota statute is far too simplistic of an approach,

effectively calling on the court to turn a blind eye to the realities and ignore

the "authoritative construction" provided by the State Board. While the

Minnesota statute prohibited wearing a "political badge, political button, or

other political insignia," the law was not problematic because of the

"unmoored use of the term 'political[.]' " Rather, it was the use of that term,

"*combined with haphazard interpretations the State has provided in official*

*guidance and representations to this Court*," which caused Minnesota's

restriction to fail before the Supreme Court. *Minnesota Voters All.*, 138 S.

Ct. at 1888 (emphasis added). The Supreme Court was particularly

troubled by the extension of the statute, by virtue of the guidance provided

by the State of Minnesota, to cover "[i]ssue oriented material designed to

influence or impact voting" and "[m]aterial promoting a group with

recognizable political views" because it would require "an election judge to

maintain a mental index of the platforms and positions of every candidate

and party on the ballot." *Minnesota Voters All.*, 138 S. Ct. at 1889-90.

In this case, on June 20, 2018, the State Board distributed material

to election officials, indicating that the New York law prohibits

"electioneering," defining that term as "statements for, or against, a

candidate or referendum on the ballot[.]" Dkt. No. 21-2 at 7. In its

guidance, the State Board specifically noted the following:

> Persons wearing clothing or donning buttons
> that include political viewpoints - i.e. support of the
> Second Amendment, Marriage Equality,
> Environmental Sustainability, Immigration Reform,
> Support for Voter ID Laws- do not violate New
> York's electioneering prohibition unless the issue
> itself is unambiguously on the ballot in the form of a
> ballot proposal.

*Id.* The State Board indicated that "New York's anti-electioneering law was

intended to prevent the political campaigns from intruding into

the polling place[, and i]t was not designed to prohibit political expression

generally." *Id*. at 8. The State Board reiterated this position in an e-mail distributed to election officials on October 3, 2018. *Id.* at 18-19.

Given the authoritative constructions provided by defendants, it is clear that the New York anti-electioneering statute does not suffer from the same constitutional infirmities identified by the Supreme Court in *Minnesota Voters Alliance*. New York's law was not designed to prohibit political expression generally, as plaintiff suggests, but was intended to prevent ballot-specific electioneering on Election Day. Despite plaintiff's urging to the contrary, I see no reason to depart from the "widespread and time-tested consensus . . . that some restricted zone is necessary in order to serve the States' compelling interests in preventing voter intimidation and election fraud." *Burson*, 504 U.S. at 207; *see also id.* at 207-08 ("[T]he link between ballot secrecy and some restricted zone surrounding the voting area is not merely timing-it is common sense. The only way to preserve the secrecy of the ballot is to limit access to the area around the voter.").

Balancing the "minor" limitation prescribed by the statute against the historical concerns with voter intimidation and election fraud, I conclude that New York's anti-electioneering law, as codified, is narrowly tailored to the interest in protecting the right of citizens to vote and conducting

reliable elections. In so holding in light of plaintiff's facial challenge, the court is construing the "statute to avoid a danger of unconstitutionality." *Ohio v. Akron Ctr. for Reprod. Health*, 497 U.S. 502, 514 (1990). Accordingly, I recommend that defendants' motions for summary judgment be granted, plaintiff's cross motion be denied, and plaintiff's complaint dismissed.[11]

IV.   SUMMARY AND RECOMMENDATION

Recent events have underscored the need for adequate safeguards to ensure free and fair elections. Indeed, New York State has a compelling interest in protecting its voters against exertion of undue influence through polling place electioneering. New York's laws are unambiguous and do not suffer from the infirmities discerned by the Supreme Court in *Minnesota Voters' Alliance*. In light of my finding that the record discloses no genuine triable issue of material fact, and that the defendants are entitled to judgment as a matter of law, dismissing plaintiff's claims, without first affording plaintiff an opportunity to conduct discovery, it is hereby respectfully

---

[11]   In light of this recommendation, I have not addressed the County defendants' alternative argument that they cannot be held liable pursuant to *Vives v. City of New York*, 524 F.3d 346 (2d Cir. 2008) because the County Board merely carries out a state law without any "meaningful" or "conscious" choice.

RECOMMENDED that defendants' motions for summary judgment (Dkt. Nos. 19 and 21) be GRANTED, plaintiff's cross motion for summary judgment (Dkt. No. 24) be DENIED, and plaintiff's complaint be DISMISSED, and

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.


David E. Peebles
U.S. Magistrate Judge


Dated:      May 24, 2019
            Syracuse, New York